**V I R G I N I A:**

### IN THE BEDFORD GENERAL DISTRICT COURT

| | | |
|---|---|---|
| CHARLENA MARIE BLAKEY,<br>    Plaintiff | ) ) ) | |
| v. | ) ) | **CASE NO. CV-16000786-00** |
| WESLEY THOMAS GILLESPIE,<br>    *Defendant.* | ) ) ) | |

### BILL OF PARTICULARS

COMES NOW the Plaintiff, Charlena Marie Blakey "Ms. Blakey," by counsel and submits her Bill of Particulars in the above-styled case, to-wit:

1. Ms. Blakey is a resident of Amherst County, Virginia.

2. Ms. Blakey is a 28 year-old female.

3. Ms. Blakey is disabled and suffers from schizophrenia and other mental disorders.

4. Defendant Wesley Thomas Gillespie ("Mr. Gillespie") is a resident of Bedford County, Virginia.

5. Mr, Gillespie is a 68 year-old male.

6. Mr. Gillespie was overweight and in poor physical condition on January 11, 2016.

7. On January 11, 2016, Mr. Gillespie was employed as a security guard by Centra.

8. Mr. Gillespie is a Special Conservator of the Peace, appointed by order of the Lynchburg Circuit Court. A true copy of his order of appointment is attached hereto and incorporated herein as **Exhibit A**.

9. Mr. Gillespie is not a health care provider as contemplated by the Virginia Medical

Malpractice Act.

10. Mr. Gillespie did not at any time provide medical services to Ms. Blakey.

11. Prior to January 11, 2016, Ms. Blakey was a regular patient of both Horizon Behavioral Health ("Horizon") and Centra Health, Inc ("Centra").

12. Ms. Blakey reported to the emergency room of Lynchburg General Hospital on January 10, 2016 to be treated for an acute psychiatric condition.

13. On January 10, 2016, Ms. Blakey was transferred from the emergency room of Lynchburg General Hospital to the adjacent Psychiatric Emergency Center ("PEC").

14. Transfers of both custodial and voluntary psychiatric patients to the PEC are governed by Code of Virginia § 37.2-808.

15. The PEC was constructed by and operated in partnership with Horizon, Centra and the Lynchburg Police Department ("LPD")

16. The PEC was located in newly renovated portion of the Dillard Building on the campus of Lynchburg General Hospital.

17. The PEC opened in November of 2015.

18. The PEC was designed and intended to provide psychiatric assessment of and psychiatric treatment to acute psychiatric patients.

19. The PEC is a secure facility – patients inside the PEC were not free to leave and a dual-door sallyport was the only means of ingress or egress from the facility.

20. The PEC was never licensed by the Virginia Department of Behavioral Health and

-2-

Developmental Services ("DBHDS") to provide psychiatric services to any patients.

21. The PEC was developed in conjunction with the Lynchburg-Central Virginia Crisis Intervention Team ("CIT").

22. CIT was formed to apply the principles of Crisis Intervention Training to reduce the risk of harm and incarceration in interactions between law-enforcement officers and other first responders and citizens suffering from mental illness or substance abuse.

23. CIT officers are required to attend 40 hours of Crisis Intervention Training, and upon successful completion of training, they are certified and placed on the roster of certified CIT officers.

24. Mr. Gillespie was not CIT certified on January 11, 2016.

25. Prior to March 26, 2016, more than six months before the PEC opened to accept patients, the CIT Coordinator, Tim Paul, conducted a tour of the PEC as it was under construction.

26. On March 26, 2016 the CIT Coordinator, Tim Paul sent a memorandum to Gina Meadows at Centra, Damien Cabezas at Horizon and John Sweeney at LPD specifically warning them of the need to exclude weapons from the PEC and the need to provide lock boxes for security officers to secure their weapons outside of the facility. A true copy of a printout of this message is attached hereto and incorporated herein as **Exhibit B**.

27. On April 1, 2016, the CIT Coordinator, Tim Paul, sent an electronic mail message to Gina Meadows at Centra, Debra Jefferson at Horizon and John Sweeney at LPD with the subject line "Security thoughts for the assessment center" specifically reminding the recipients of the "worst case scenario" in which an acute patient could obtain an officer's

-3-

weapon inside the PEC. A true copy of a printout of this message is attached hereto and incorporated herein as **Exhibit C**.

28. On January 10, 2016, Jonathan Warner ("Mr. Warner") reported to the emergency room of Lynchburg General Hospital for treatment of an acute psychiatric illness.

29. Mr. Warner is a resident of Amherst County, Virginia.

30. Mr. Warner is a 28 year old male.

31. Mr. Warner and Ms. Blakey are former schoolmates and were friends.

32. Mr. Warner was in excellent physical condition when he reported to Lynchburg General Hospital on January 10, 2016.

33. Prior to January 11, 2016, Mr. Warner was a regular patient of both Horizon Behavioral Health ("Horizon") and Centra Health, Inc ("Centra").

34. On January 10, 2016, Mr. Warner reported to staff at the emergency room that he had not slept for days and was suffering from a poor adjustment of psychiatric medication.

35. At approximately 12:30 a.m., a Centra physician, Dr. Michael Dunlop, applied for and obtained an Emergency Custody Order ("ECO") from the magistrate authorizing the emergency custody of Mr. Warner. A true copy of this ECO is attached hereto and incorporated herein as **Exhibit D**.

36. In order to obtain an ECO Dr. Dunlop was required to swear or affirm that due to Mr. Warner's acute condition, Mr. Warner posed a threat to safety of himself or others.

37. Mr. Gillespie was aware of the above-referenced ECO.

-4-

38. Mr. Gillespie knew, or reasonably should have known, that Mr. Warner posed a danger to himself or others on January 11, 2016.

39. Mr. Warner's psychiatric condition steadily worsened after 12:30 a.m. - he became paranoid and began to experience intense auditory and visual hallucinations. He began to frantically pace and had to be redirected to an emergency room bay.

40. At approximately 4:15 a.m., a Centra physician ordered Mr. Warner to be transferred from the Emergency Room to the PEC.

41. Mr. Gillespie and a female Centra security officer escorted Mr. Warner from the Emergency Room to the PEC.

42. Ms. Blakey was in a patient room inside the PEC when Mr. Warner was transferred to the PEC.

43. Mr. Gillespie and the female Central security guard delivered Mr. Warner to the PEC and then left the PEC.

44. A few minutes later, Mr. Gillespie entered the PEC alone.

45. Mr. Gillespie carried weapons, including at least one pistol and at least one TASER, into the PEC.

46. Mr. Gillespie confronted Mr. Warner inside the PEC.

47. Mr. Warner became agitated and began pacing inside the PEC.

48. Mr. Warner was suffering from extreme psychosis during his interaction with Mr. Gillespie.

-5-

49. Mr. Gillespie told Mr. Warner that if he did not comply with treatment recommendation, he would be injected with medication.

50. Mr. Gillespie told Mr. Warner that he would remain in the PEC "forever" unless he complied with treatment conditions.

51. At approximately 4:40 a.m.. Mr. Gillespie assumed a hostile and confrontational posture directly in front of Mr. Warner.

52. Shortly thereafter, Mr. Gillespie made an aggressive gesture toward Mr. Warner by raising both of his fists quickly.

53. Mr. Warner responded by pushing Mr. Gillespie against a wall and by attempting to relieve him of his firearm.

54. During the ensuing struggle, Mr. Gillespie removed his TASER from its holster.

55. Mr. Warner seized Mr. Gillespie's TASER and ran to a nursing station.

56. Mr. Warner discharged the TASER and its electrodes were expelled and hit a wall, harmlessly.

57. The discharged TASER was incapable of further expelling electrodes..

58. An unarmed Central security guard, Jason Bryan ("Mr. Bryan"), who was stationed inside the PEC attempted to tackle Mr. Warner.

59. Mr. Gillespie stood by and did not act as Mr. Bryan acted.

60. Mr. Bryan was unsuccessful in his attempt to tackle Mr. Warner.

61. Mr. Bryan fled to a nearby patient room and Mr. Warner pursued him with the discharged

-6-

TASER in his right hand and then briefly attempted to strike Mr. Bryan with the discharged TASER.

62. Mr. Warner then exited the patient room and re-entered the main area of the PEC.

63. Upon exiting the patient room, Mr. Gillespie, standing approximately 10 to 15 feet away from Mr. Warner, without warning, shot Mr. Warner several times with a pistol.

64. Mr. Warner attempted to run toward the PEC's sallyport, but fell to his knees and began crawling towards the door.

65. As he crawled past Mr. Gillespie, Mr. Gillespie turned and fired another shot from his pistol into Mr. Warner's back.

66. Ms. Blakey directly witnessed the shooting and was standing only a few feet away from Mr. Warner when he was shot.

67. Ms. Blakey was subject to the sounds of multiple gunshots just outside of her patient room.

68. Ms. Blakey directly witnessed Mr. Gillespie shoot her friend Mr. Warner in the back.

69. As a result of witnessing the shooting of Jonathan Warner, Ms. Blakey suffered severe emotional distress.

70. Ms. Blakey's physical injuries as a result of witnessing the shooting of Jonathan Warner, including insomnia, loss of appetite and post-traumatic stress disorder.

71. Ms. Blakey was treated for injuries and emotional distress by Horizon after the shooting of Jonathan Warner.

-7-

72. Ms. Blakey continues to suffer from post-traumatic stress disorder.

73. Code of Virginia § 37.2-400 was designed, intended and operates to protect public safety.

74. Ms. Blakey is a member of the class of people for whose benefit Code § 37.2-400 was created.

75. Mr. Gillespie had a duty to keep Ms. Blakey free from neglect.

76. Mr. Gillespie breached his duty to keep Ms. Blakey free from neglect.

77. Mr. Gillespie's neglect in violation of Code § 37.2-400 was a proximate cause of Ms. Blakey's injuries and damages.

78. Mr. Gillespie's actions inside the PEC were negligence *per se*.

79. Mr. Gillespie was acting under color of state law by transporting Mr. Warner to the PEC.

80. Mr. Gillespie had a statutory duty to transport Mr. Warner only to a properly licensed psychiatric facility.

81. Mr. Gillespie breached his statutory duty to transport Mr. Warner only to a properly licensed psychiatric facility by transporting Mr. Warner to the unlicensed PEC.

82. The incidents that led to the shooting of Jonathan Warner – Mr. Warner's attempt to disarm Mr. Gillespie, the ensuing struggle, the danger to patients and employees and the resulting injuries to Mr. Warner and Ms. Blakey were foreseeable. Indeed these incidents had been specifically foreseen and communicated to Centra and Horizon.

83. Mr. Gillespie's breach of his duty to transport Mr. Warner only to a licensed facility was a proximate cause of Ms. Blakey's injuries and damages.

-8-

84. Mr. Gillespie had a duty as a Special Conservator of the Peace to faithfully and lawfully execute his duties.

85. Mr. Gillespie's order of appointment as a Special Conservator of the Peace provides that he "shall be permitted to perform the duties of a law-enforcement officer at the discretion and discretion" of Centra.

86. Mr. Gillespie was performing the duties of a law-enforcement officer while escorting Mr. Warner to the PEC and while supervising Mr. Warner inside the PEC.

87. Mr. Gillespie had a duty to Ms. Blakey to act lawfully inside the PEC.

88. Mr. Gillespie had a duty to conform to Centra's policies at all times.

89. Mr. Gillespie did not act lawfully inside the PEC. He used excessive force, in violation of state and federal law, against Mr. Warner.

90. Mr. Gillespie, upon information and belief, did not act in conformity with Centra's policies in transporting Mr. Warner to the PEC and in supervising Mr. Warner inside the PEC on January 11, 2016.

91. Mr. Gillespie breached his duty to act lawfully inside the PEC on January 11, 2016.

92. Mr. Gillespie breached his duty to act in conformity with Centra's policies while inside the PEC on January 11, 2016.

93. Mr. Gillespie's breach of his duty to act lawfully inside the PEC was a direct and proximate cause of Ms. Blakey's injuries and damages.

94. Mr. Gillespie's breach of his duty to act in conformity with Centra's policies was a direct

-9-

and proximate cause of Ms. Blakey's injuries and damages.

95. Mr. Gillespie had a duty to properly supervise Mr. Warner inside the PEC on January 11, 2016.

96. Mr. Gillespie knew, or reasonably should have known, that Mr. Warner, due to his illness, posed a danger to himself or others on January 11, 2016.

97. Mr. Gillespie knew, or should reasonably have known, that he was incapable of restraining Mr. Warner without assistance on January 11, 2016.

98. Mr. Gillespie knew, or should reasonably have known, that carrying weapons into the PEC was dangerous.

99. Mr. Gillespie had a duty to prevent weapons from entering the PEC on January 11, 2016.

100. Mr. Gillespie breached his duty to properly supervise Mr. Warner on January 11, 2016.

101. Mr, Gillespie breached his duty to exclude weapons from the PEC on January 11, 2016.

102. Mr. Gillespie' breach of his duty to properly supervise Mr. Warner on January 11, 2016 was a direct and proximate cause of Ms. Blakey's injuries.

103. Mr. Gillespie's breach of his duty to exclude weapons from the PEC on January 11, 2016 was a direct and proximate cause of Ms. Blakey's injuries and damages.

104. Ms. Blakey incurred substantial damages including pain, suffering, weakness, nervousness, loss of appetite, trauma, severe emotional distress and loss of sleep.

**Respectfully submitted,**

**CHARLENA MARIE BLAKEY**
**By Counsel**

-10-

**JAMES RIVER LEGAL ASSOCIATES**
7601 Timberlake Road
Lynchburg, Virginia 24502
P (434) 845-4529
F (434) 845-8536

By:_____

    **M. Paul Valois, Esquire**
    **Counsel for Defendant**
    **Virginia State Bar No. 72326**

## CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the foregoing **BILL OF PARTICULARS** was mailed by first-class United State Postal Service mail, postage prepaid , this 27th day of May, 2016 to Cynthia L. Santoni, Esquire, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, 8444 Westpark Drive, Suire 510, McLean, Virginia 22012.

_____

        **M. Paul Valois**

### CERTIFICATE PURSUANT TO VIRGINIA CODE SECTION 8.01-391-B

This is to certify that I am the legal custodian of the foregoing record and further that this is a true and authentic copy of the original record.

                                    Clerk

By:_____
Deputy Clerk

-11-

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

IN RE:     APPOINTMENT OF WESLEY THOMAS GILLESPIE AS          CL13007663-15
           SPECIAL CONSERVATOR OF THE PEACE PURSUANT TO
           SECTION 19.2-13 OF THE CODE OF VIRGINIA, 1950,
           AS AMENDED.

ORDER OF APPOINTMENT

This day came, Centra Health, Inc., a Virginia non-stock corporation, by counsel, upon its Petition

praying for the appointment of the hereinafter named employee as special conservator of the peace, and was

argued by counsel.

The Court finds that the petitioner has its corporate offices at 1920 Atherholt Road, Lynchburg,

Virginia. The Court further finds that Centra Health, Inc. ("Centra"), itself and through its affiliates and

divisions, owns or leases properties on which it operates various entities which provide or support its

provision of health care services to members of the public. The various entities are located in the jurisdictions

of the 24th Judicial Circuit, including entities in the City of Lynchburg, and in the Counties of Bedford,

Campbell, and Amherst.

The Court further finds that appointment of Wesley Thomas Gillespie as Special Conservator of the

Peace is necessary for the security of property and the peace in the geographical locations referenced above;

that Wesley Thomas Gillespie has met the registration and training requirements established by the Virginia

Department of Criminal Justice Services to be designated as an armed Special Conservator of the Peace; and

that Wesley Thomas Gillespie is the proper person to perform the duties of Special Conservator of the Peace.

Wherefore, the Court does Adjudge, Order, and Decree that Wesley Thomas Gillespie be, and

Wesley Thomas Gillespie hereby is, appointed to the position of Special Conservator of the Peace for the

geographical locations and on the petitioner's premises referenced above, which are located in the 24th Judicial

Circuit, specifically including its entities in the City of Lynchburg and in the Counties of Bedford, Campbell

and Amherst, as well as in the streets and sidewalks adjacent to the grounds thereof, on properties currently owned or leased by, and any properties acquired or leased after the date of this Order but during the four-year term of appointment, Centra Health, Inc. for a period of four years from this date pursuant to *Va. Code* § 19.2-13, as amended; that Wesley Thomas Gillespie shall have all the powers, functions, duties, responsibilities and authorities of Special Conservator of the Peace; that Wesley Thomas Gillespie shall be considered a "law enforcement officer" for the purposes of *Virginia Code* § 37.2-808 et seq. and *Virginia Code* 16.1-335 et seq. (or any amended version of said *Code* sections), and shall be permitted to perform the duties of a law-enforcement officer at the direction and discretion of Petitioner and/or its affiliates and divisions; that he may use the title "police" on any badge or uniform worn in the performance of his duties; that such individual may affect arrests, at the discretion and direction of his employer Centra Health, Inc. or its affiliates or divisions, using up to the same amount of force as would be allowed to a law-enforcement officer employed by the Commonwealth or any of its political subdivisions when making a lawful arrest; and that Wesley Thomas Gillespie is designated as an armed Special Conservator of the Peace, authorized to carry a weapon while within the scope of his employment as such.

As required by *Va. Code* § 19.2-13 (E), the statistical information for Wesley Thomas Gillespie is as follows:

Wesley Thomas Gillespie .
Social Security Number - see Addendum for Protected Identifying Information
(attached hereto)
Date of Birth - ███████  ████
Male; Caucasian
Height - 6' 0"
Weight - 225 lbs
Eye color - brown; Hair color - white

It is *Further Ordered* that before entering upon the duties of such office, Wesley Thomas Gillespie shall be required to enter into a bond with approved security before the Clerk of the Circuit Court of the City of Lynchburg, in the amount of $10,000.00, conditioned upon the faithful performance of such duties as conservator of the peace in any locality in which he is authorized to act pursuant to this Order.

It is *Further Ordered* that this Order be spread upon the records of the Law Order Book of each

of the Courts of Record in said 24th Judicial Circuit and a certified copy shall be mailed to Holly Brooke

Trent, Esq., Attorney for Petitioner, and to Wesley Thomas Gillespie by the Clerk of this Court.

And the objects of this proceeding having been accomplished it is *Ordered* to be stricken from the

docket.

Enter     $8 / 29 / 13$

_____

Judge

I Ask for This:

_____

Holly Brooke Trent (VSB # 66662)
*Associate General Counsel, Centra Health*
1901 Tate Springs Road
Lynchburg, Virginia 24501
(434) 200-2163
*Holly.Trent@centrahealth.com*



| Lynchburg–Central Virginia Crisis Intervention Team |
| Coordinator's Office |

March 26, 2015

To:      Gina Meadows, Centra Health

CC:      John Sweeney, Lynchburg Police Department
             Damien Cabezas, Horizon Behavioral Health
             Melissa Lucy, Horizon Behavioral Health
             Debra Jefferson, Horizon Behavioral Health

Following my visit to the emerging Assessment Center at Lynchburg General Hospital, I have the following thoughts and observations to share with you. I hope that you will find these comments helpful and that they may provoke some discussion that may improve or enhance plans already underway for this outstanding facility.

First, the design seems well and carefully thought out. It makes excellent use of somewhat limited space. Here are some features that need to be considered.

1. A <u>video-conferencing system</u> to a magistrate's office for conducting remote appearances/hearings of persons facing criminal charges. There is a room for teleconferences but I don't believe this usage is contemplated for that space. It would require that such defendants walk through the work area with work stations, counters and office furniture all within their easy grasp, not to mention staff. Two possibilities: first, one of the CIT rooms could be fitted with video-conferencing equipment for this purpose. Second, perhaps one more room in the hallway near the Coordinator's office could be utilized for this purpose, or a portion of the Lobby area across the hallway from the Coordinator's office could be partitioned into a room for this purpose. This space could also double as a semi-private waiting area for patients' family members when not in use for video-conferencing. See also, #2 below.

2. I do not know the plan for the Security desk station (109). It will be important to have <u>computer access for law enforcement officers</u> to file reports with their home agencies to the extent that that is possible. This is the best means of capturing all necessary data about each call. Delayed filing inevitably leads to lost and incomplete data and incorrect time entries. I note that there is a room (former dorm room perhaps?) immediately adjacent to the CIT secure area and accessed from the North wing hallway, across that hallway from the new proposed lobby area, that might make an excellent satellite office for law enforcement officers to conduct their report writing, make telephone calls, straighten up their uniforms following fights, wrestling matches, or even interview witnesses or family members who may be present. This room would also appear to be a good alternative location to set up video-conferencing to magistrates. I do not know how important the existence of the Dictation room (112) is within the secure area. If it is not intended for frequent or critical use, it too might serve as a good work area for the officers

1

Exhibit B
(Page 1 of 2)

(although without the flexibility offered by the room in the hallway, and probably with little potential for video-conferencing.)

3. A conversation should be held and agreement reached about a policy with regard to firearms. When police officers are present, there are firearms present. The more officers, the more firearms. In a crowded facility, like this one with up to 4 or more officers arriving and/or standing by with ECOs, the potential risk of an incident increases exponentially. The surprise factor also increases as more officers tends to increase the confidence level – and with it, perhaps a relaxed attitude – about the presence of firearms. A storage area consisting of gun lockers with removable keys or a combination lock should be considered for all officers entering this secure facility. It is not necessarily the violent patients, but rather those from whom no violent acts are expected, but whose mental state is such that they may do unpredictable and seemingly irrational things, in whom the danger may lie.

4. Design input and advice should be sought quickly about the technological issues of computer access and video-conferencing in order to avoid re-designing physical spaces or eliminating the possibility of utilizing such technology as this project moves forward.

Safety and security are among the most important considerations for this facility. Safety and security for patients, staff and others who must use this facility. In order to assure a reliable and professional capability of all security and police officers associated with this facility, CIT training must be the minimum standard for persons employed in this capacity. Officers need to feel confident that when they transfer custody of ECOs, the receiving officer is professionally trained and security conscious to accept the responsibility. The staff that work in this facility must have this same level of trust and confidence in the security officers in whose hands their own safety is placed. In addition to CIT training, which focuses on communications techniques, all officers must meet standards for defensive tactics and use of restraining devices and incapacitation techniques and devices. Any unexpected schedule vacancy or emergency time off by a scheduled security officer represents a potential weakness in the overall system unless qualified back-ups are available to fill such vacancies. Less well-trained officers are not an acceptable alternative, as their very status of being less well-trained is the exact nature of the danger presented.

I recommend a committee made up of law enforcement, Centra Health professionals and Horizon Behavioral Health professionals to whom all complaints from and about staff will be addressed. When working in an interdisciplinary environment where different cultures come together, it can be important to have a body that considers complaints and incidents to determine where the actual problem lies. It may simply be the difference in culture (attitude) or the lack of appreciation for someone else's procedures (safety and efficiency), rather than actual wrong-doing or incompetence of another staff/security person. Learning to work together and support each other's work is critical to the success of this project. A committee, as proposed, should consist not of administrators, but rather of seasoned supervisors who are known problem-solvers and trainers. It goes without saying that these committee members should be CIT trained.

2

Exhibit B
(Page 2 of 2)

Security thoughts for assessment center
Tim D Paul
to:
Gina Meadows
04/01/2015 11:41 AM
Cc:
"Debra Jefferson", John W Sweeney
Bcc:
Cynthia L Kozerow
Hide Details
From: Tim D Paul/PubSafe/COL

To: "Gina Meadows" <Gina.Meadows@Centrahealth.com>

Cc: "Debra Jefferson" <Debra.Jefferson@horizonbh.org>, John W Sweeney/PubSafe/COL@COL

Bcc: Cynthia L Kozerow/PubSafe/COL@COL

Gina,

In considering the physical layout of the assessment center further, I keep returning to thoughts of a "worst case scenario" in which a patient obtains an officer's gun, or is so violent that he/she cannot be physically controlled by security/police present. I am thinking of a situation in which one or more staff (and security possibly) simply need to retreat from the holding area. Since egress through the main door may not be possible, it seems to me that

1. there should be a steel door with suitable lock in the doorway between the Nurses' Station and Security Station into the "Work Area" along the outside wall.
2. In addition, since this would effectively trap those inside, an outside exit should be available from the Work Area. This exit should not be in a direct line with the security door between the Work Area and the Nurses Station/Security Station area.
3. CCTV should be able to monitor the Nurses/Security Station area outside the barrier door to enable those inside the Work Area to know what the out-of-control patient is doing and to check on the condition of any injured person left in the holding area.
4. It would also be a good idea to assure that the doors to both the Storage room and the Supplies/Meds room have locks on the inside (keys kept in Work Area), so that a person unable to retreat into the Work Area before that door is locked could find some shelter in either of these other two rooms.

Other than the outside exit proposed from the Work Area, none of these other suggestions seems to carry and undue cost burden. It is possible that funds from the Horizon Assessment Center grant might be available for these types of expenses.

Case 6:18-cv-00064-EKD Document 9-5 Filed 09/20/18 Page 17 of 18 Pageid#: 75
file:///C:/Users/tdp/AppData/Local/Temp/notesAE956C/~web4123.htm

Exhibit C

# EMERGENCY CUSTODY ORDER
Commonwealth of Virginia    VA. CODE §§ 37.2-808, 19.2-182.9; § 37.2- 17.2

Case No. .......................................................
## ECO 680GM1600000392

Lynchburg ...................................................................    [ ] Circuit Court   [X] General District Court

Johathan Warner ................................................    ......................., Amherst, VA 24521

NAME A[  ] ADDRESS OF

## TO ANY AUTHORIZED OFFICER OF:

Lynchburg ....................................................................

This emergency custody order is hereby issued
[X] upon motion of the undersigned  [ ] upon a sworn petition
[X] and facts presented by

| RACE | SEX | BORN | | | HT. | WGT. | EYES | HAIR |
|------|-----|------|---|---|-----|------|------|------|
| | | MO. | DAY | YR. | FT.  IN. | | | |
| W | M | | | | | | BLU | BRO |
| SSN | | | | | | | | |
| DLO | | | | | | STATE | | |

Dr. Michael Dunlop                (434) .00 - 7387

NAME                             TEL EPH  NO NUMBER

based upon probable cause to believe that the respondent:

[X] pursuant to § 37.2-808, is incapable of volunteering or t  willing to volunteer
for treatment, has a mental illness and is in need of hosp  italization or treatment, and there exists a substantial likelihood that, as a result of
mental illness, the respondent will, in the near future, ca  se serious physical harm to self or others as evidenced by recent behavior causing,
attempting, or threatening harm and other relevant infor   mation OR suffer serious harm due to respondent's lack of capacity to protect self
from harm or to provide for respondent's own basic hur  an needs;

[ ] pursuant to § 19.2-182.9, is an acquittee on conditional  rlease, and has violated the conditions of release or is no longer a proper subject
for conditional release, and requires inpatient hospitaliz  ion.

[ ] The respondent failed to appear for a hearing on ................    .... to review a [ ] mandatory outpatient treatment plan [ ] discharge plan
pursuant to § 37.2-817.2.    DATE

THEREFORE, you are commanded to execute this order, take th  respondent into custody and

[X] transport the respondent to the location listed below for  valuation by a person designated by the community services board or behavioral
health authority who is skilled in the diagnosis and trea  ent of mental illness and who has completed a certification program approved by
the Department of Behavioral Health and Development  l Services in order to assess the need for hospitalization or treatment.

[ ] transfer custody of the respondent to the alternative tran  portation provider, ..............................................................
DC-4000, ORDER FOR ALTERNATIVE TRANSPORTATION)  rovider, is attached.

Custody of the respondent may be transferred pursuant to § 37.2-  08(F). The respondent shall remain in custody until a temporary detention order is
issued, until the evaluator finds that the respondent does not meet  he criteria for detention, or until this emergency custody order expires. If the
undersigned judicial officer issues this order pursuant to § 19.2-1  2.9, the period of custody may not exceed eight hours from the time that you
execute this order. If the undersigned judicial officer issues this o  der pursuant to § 37.2-808, then (1) the order is void if not executed within eight
hours of the time of issuance and (2) the order is valid for a perio  not to exceed eight hours from the time of execution. If the order becomes void
for lack of timely execution, pursuant to § 37.2-808(M), a law-en  orcement officer must return the order to the office of the clerk of the issuing court,
or, if such office is not open, to any magistrate serving that court.

1901 Tate Springs Road, Lynchburg, VA 24501 ...................................................................
CURRE  T LOCATION OF RESPONDENT

Lynchburg General Hospital    :        190  1 Tate Springs Road, Lynchburg, VA 24501
NAME AND ADDRESS OF  OCATION FOR EVALUATION OR EXAMINATION

[ ] Transport the respondent to the medical facility (specif  d below) to obtain the following:

[ ] emergency medical evaluation or treatment, befor  transporting the respondent to the above specified location for evaluation.
[ ] a medical evaluation, before transporting the resp  ident to a hospital at which the respondent may be admitted for detention if a
physician at that hospital requires a medical evalu  ion of the respondent prior to the admission.

.............................................................................
NAME AND ADD  ESS OF MEDICAL EVALUATION FACILITY

TO THE PERSON CONDUCTING THE MENTAL HEALT  EVALUATION:
Virginia Code § 37.2-808 and § 19.2-182.9 require that you eval  ate the respondent pursuant to this order. Upon completion of your evaluation,
promptly report the results of your evaluation to the appropriate j  dicial officer.

TO THE PERSON PROVIDING EMERGENCY MEDICAL  EVALUATION OR TREATMENT:
Virginia Code § 37.2-808 requires that you conduct the medical  valuation or treatment immediately in accordance with state and federal law.

TO ANY HEALTH CARE PROVIDER as defined in Virginia  Code § 32.1-127.1:03, or other provider who has provided or is currently providing
services to or is currently evaluating the respondent: Virginia Co  e § 37.2-804.2 requires you to disclose certain information upon request. (See Page
Two, AUTHORIZATION FOR DISCLOSURE AND USE OF  EALTH INFORMATION.)

PRINTED BY: WORDSHI

01/11/2016 01:18 AM        DATE        1/27/2016
DATE AND TIME OF ISSUANCE

[X] MAGISTRATE [ ] JUDGE [ ] SPECIAL JUSTICE

FORM DC-492 (MASTER, PAGE ONE OF TWO) 07/14        Kristen Pettibone

Exhibit D