# COMMONWEALTH'S ATTORNEY'S REPORT ON THE SHOOTING OF JONATHAN WARNER
## Centra Lynchburg General Hospital
## January 11, 2016

Michael R. Doucette
Commonwealth's Attorney
City of Lynchburg
June 3, 2016

1

## INVESTIGATIVE PROCESS

At 4:43 a.m. on January 11, 2016, Jonathan Warner was shot four times by Centra security supervisor Wesley Gillespie at the Dillard Psychiatric Emergency Care (PEC) Building of the Lynchburg General Hospital. Within a very short period of time, the Criminal Investigations Division (CID) of Lynchburg Police Department (LPD) began an investigation into this shooting.

About an hour later, CID Capt. Ryan Zuidema called me at home to let me know what had happened. He summarized what they knew at the time and named the parties involved. That afternoon, I met with Detective Chad Davis, who was in charge of this investigation, and the other detectives involved to discuss their findings. I also had the opportunity to review the video of the shooting at that time. That was the first of many viewings.

At no point did I have any concerns about the LPD investigating this case. However, Mr. Warner's attorney, Paul Valois, has publicly complained that there is some sort of conflict of interest. He seems to feel that there is some sort of law enforcement bias in favor of private security officers.

It is a fact that Mr. Gillespie was a Lynchburg police officer in the 1970's until he was wounded in the line of duty. Many years ago, he was also an LPD chaplain. His son is an LPD lieutenant. However, the longest serving member of LPD started his career in 1984 so there is no one with LPD that ever worked with Mr. Gillespie. His son was specifically excluded from any aspect of this investigation.

LPD CID has the capabilities to investigate the matter fully and fairly. I have worked closely with LPD for 32 years and have full confidence in their abilities. Ultimately, I agreed to review the results of the final LPD investigation. If I was satisfied that the final LPD report gave all the information I needed to make an informed decision, it would suffice. If I was not so satisfied, I reserved the right to demand a Virginia State Police investigation.

I have read the entire final LPD report. I have asked for, and received, a few additional facts. With that I am satisfied that I have been provided the information needed to make an informed decision. The video is the most important piece of that information, even if there is no corresponding audio.

## THE ISSUE OF RECUSAL

I decided not to request the appointment of a special prosecutor. I do not know and am not friends with Mr. Gillespie or Mr. Warner and therefore have no personal bias for or against them. I know Mr. Gillespie's son only well enough to say "hello" to him if we pass.

As far as the possibility of some professional bias in favor of former police officers or private security guards (a remote possibility indeed), any other special prosecutor appointed could be accused of the same thing. Therefore, there is no advantage to such an appointment. To the

2

contrary, it could be a disadvantage to have such an appointment. Any special prosecutor would most likely be from a jurisdiction far removed from Lynchburg. Such an individual could come from their home jurisdiction, simply make the decision whether to place charges and go home again without being answerable to the citizens of Lynchburg.

While no special prosecutors were appointed, I did reach out to three of my colleagues around the Commonwealth for their independent conclusions. Those three are Donald Caldwell, Colin Stolle, and Shannon Taylor; Commonwealth's Attorneys for the City of Roanoke, Virginia Beach, and Henrico County, respectively. In fact, Ms. Taylor recently attended a week-long use of force seminar in Northern Virginia conducted by the Force Science Institute.

I provided copies of the investigative materials, including the video, to each of them. I asked them to independently review the materials. I then talked to them individually without telling them my conclusions. Each one reached the exact same conclusion I did.

I know that deciding whether to place criminal charges against either party in this matter could be tough. Regardless of what I decide, there may be a segment of the community who will disagree with my call. Mr. Valois has been very public in his calls for charges against Mr. Gillespie. But, in counterpoise, I have received a number of phone calls demanding that instead of charging Mr. Gillespie, I should charge Mr. Warner.

However, I was elected by the people of Lynchburg to make these tough decisions. Like any umpire or referee, I have to screen out the shouts of those vocal spectators, exercise my personal integrity and call it the way I see it. Being aware of possible accusations of professional bias will just make me more guarded to decide this matter on the facts.

## THE FOCUS OF THIS REPORT

It is important to discuss at the outset what this report is and what it is not.

This report is concerned solely with whether state criminal charges should be placed against Mr. Gillespie or Mr. Warner. That determination must be based on a cold, balanced examination of the facts.

This report is not concerned with any civil culpability. It is not concerned with the rationality of Centra administrative policies, procedures or practices; nor whether this incident on January 10-11, 2016 could have been handled differently or better. I am not and never have been a sworn police officer or a security officer. My training and experience have been with the Constitution, the criminal laws and the court procedures in Virginia. Therefore, I limit my professional opinion to whether there have been any violations of these state criminal laws.

The conclusions I have reached in this matter have been based on standards I have practiced daily in 32 years as a prosecuting attorney in Lynchburg. As stated above, any criminal charge, whether in this matter or any other case, must be based on facts. Those facts must be of

3

sufficient cumulative weight that they will probably convince a judge or jury beyond a reasonable doubt that the defendant has engaged in conduct which violates the criminal laws of Virginia. Anything less is not enough.

Therefore, my analysis starts with a determination of what happened factually in the Psychiatric Emergency Care Building on January 11, 2016. Since I was not there to witness this event with my own eyes and ears, I must rely on the hospital's video recording, the results of the police investigative reports and draw my own factual conclusions. As with any determination of fact, I can and should "consider the appearance and manner of the witnesses . . ., their intelligence, their opportunity for knowing the truth and for having observed the things about which they [have given a statement], their interest in the outcome of the case, their bias, and, if any have been shown, their prior inconsistent statements . . .." *Virginia Model Jury Instruction – Criminal 2.500*. Additionally, I am "entitled to use [my] common sense in judging any [evidence]." *Id.*

Once, I have determined what probably occurred on January 11th, based on the weight of the evidence, I must then apply the law to those facts to see whether any state criminal laws have been violated and whether any charges should be filed.

## THE EVENTS OF JANUARY 10-11, 2016

Around 9:30 p.m. on January 10, 2016, Jonathan Warner was taken by family members to the Lynchburg General Hospital Emergency Room. Warner has suffered for some time with significant psychological disorders that require medication to keep under control. On the night he went to the hospital, Warner had not been taking his medications for several days.

Stephen Warner provided hospital staff with most of his brother's medical history. He said that the family was concerned over Warner's behavior over the last two weeks. Warner had shown increasing anxiety, decreasing appetite and had not slept in four days. The family was hoping that the hospital could get Warner placed at Virginia Baptist Hospital to get his medications regulated. While this conversation was going on, Warner would not speak or make eye contact with anyone in the emergency room.

A short time later, Warner's family left the hospital, saying that they would return in the morning. They were not present at the hospital 5 to 6 hours later when Warner was shot.

At 10:46 p.m. an emergency room doctor assessed Warner's mental state. In addition, he spoke with Warner's counselor from Horizon Behavioral Health about Warner's history and current symptoms. Based on Warner's behavior and few brief comments[1], the doctor concluded that an emergency commitment order (ECO) should be obtained. The magistrate issued the ECO at 1:18 a.m. on January 11th.

---

[1] For instance, when the doctor told Warner that if he would agree to take the same medications that had been previously prescribed, they could have him stay at the PEC instead of obtaining an ECO, Warner replied, "What do you know about geology?"

4

Another counselor from Horizon who was working at the emergency room that night began talking to Warner to see if he had any suicide ideation. She explained to Warner that an ECO had been issued and that he was not free to leave at that point.[2] She then evaluated Warner for approximately two hours to see whether a temporary detention order (TDO) should be issued.[3] During this evaluation, Warner asked her whether he could be transferred to the PEC.

The counselor then spoke with hospital security and confirmed that the ECO had not yet been served on Warner. Eventually, the counselor and the medical staff all agreed that if Warner would voluntarily agree to treatment at the PEC, they would not serve the ECO. The counselor's final disposition was that Warner was actively psychotic but volunteering to be admitted to the PEC unit.

At approximately 4:15 a.m., Centra security supervisor Wes Gillespie[4] arranged with another security officer to walk Warner the short distance from the emergency room building to the PEC building.[5] The PEC has a secured door so only authorized persons can enter or leave. It also has a video camera installed so that most activity in the main room is video recorded. However, the camera does not also record audio. Once Warner was safely in the PEC, Gillespie shook hands with Warner and he and the other officer left.

The staff on duty in the PEC at that time included Melea Moore, a Centra nurse; Erin Rudder, a Horizon intake officer; and Jason Bryan, a plain clothes Centra security officer. After Gillespie left, Moore noticed that Warner was pacing hard about the room and that he was wide-eyed, agitated and mostly non-verbal. She explained to him the process of how they were going to administer him some medication and let him sleep until he could be seen by a psychiatrist in the morning. She also asked him if he would like something to eat or drink. After 2-3 minutes of not answering, Warner finally said he didn't want anything to eat or drink but wanted Gillespie to come back over. Moore said that her "sixth sense" - based on working in mental health for six years - told her that Warner was "ready to go off."

Gillespie arrived back at the PEC at 4:21 a.m. Warner then asked if he could use the phone to make a call. Gillespie allowed Warner to dial the phone number but no one answered. When Warner hung up, there were tears in his eyes, his hands stiffened and he said "she didn't answer." At 4:26 a.m., Moore told Bryan to take off his badge, put his pen away and move the phone because she knew "it was coming."

---

[2] It is important to note that the ECO had not been served at this time on Warner. In fact, the ECO was never served.
[3] Had a TDO been issued, Warner would have been in custody and involuntarily taken to the Virginia Baptist Hospital. He would not have been eligible to stay at the PEC.
[4] Gillespie is a special conservator of the peace (SCOP). As such, he met the registration and training requirements set forth by the Virginia Department of Criminal Justice Services and was appointed an SCOP by circuit court order. His training was current as of the date of this incident.
[5] Gillespie had talked earlier with Warner while he was in the emergency room and seemed to gain some rapport with him there.

5

Gillespie was able to help Moore explain some of the paperwork to Warner. At one point, Warner asked Gillespie, "Do you believe in God?"[6] Warner then followed up by asking, "What is his name?" Gillespie and Warner carried on a conversation about religion for a while.

At 4:31 a.m., Moore contacted the hospital's pharmacy department to tell them that it was imperative that they authorize the dispensing of appropriate medication for Warner.[7] Around 4:35 a.m., Moore asked Rudder, who was in the back room, to re-contact the pharmacy. She told Rudder to tell the pharmacy that if they did not authorize the medications in the next five minutes, they were going to have a "Code Atlas" (Patient Out of Control/Officer Needs Help). Rudder spoke to a woman in the pharmacy department who told Rudder to contact Admissions since the computer system was not indicating that Warner had been transferred from the Emergency Room to the PEC. Rudder tried to contact Admissions but the line was busy. She left the call on the speaker phone allowing it to ring.

Moore then went back into the medication room in an effort to get the medication from the Accudose system. She knew at that point "it was a race against the clock." She kept entering and re-entering Warner's name into the system but was unsuccessful in obtaining the medications.

In the meantime, Gillespie and Bryan kept trying to talk to Warner and defuse his agitation. Gillespie was standing directly in front of Warner, about a foot apart, and Bryan was about three to four feet behind and to the left of Gillespie.

At 4:43:01 a.m., Warner shifted his weight slightly to his left foot and then lunged with both hands for the pistol on Gillespie's left hip.[8] Gillespie immediately started back-stepping as quickly as he could while using his hands to pry Warner's hands off of the pistol, which was in a level three retention holster. Gillespie retreated back and around the counter until he backed into a pillar. At this point, after Gillespie and Warner had passed by him, Bryan alternately grabbed Warner's waist, arms and legs in an effort to get him off Gillespie. Gillespie tried punching Warner in the head but that had no impact. At some point in this struggle, Gillespie's radio came off his belt and was dangling by the cord onto the floor. Gillespie said that he knew at that time if Warner got his pistol, "everyone in this room was going to die."

Between Gillespie's and Bryan's efforts tugging back on Warner, Gillespie was able to use his left hand to go to his left waist where his Taser was located. At 4:43:21, he was able to get his Taser out of its holster. Warner immediately switched from trying to grab the pistol on Gillespie's right hip to grabbing the Taser out of Gillespie's left hand. At 4:43:26, Warner was able to pull the Taser out of Gillespie's hand with his right hand. Gillespie and Bryan initially both began to back up but then Bryan began coming towards Warner to try to get the Taser

---

[6] Gillespie is also an ordained minister.
[7] The hospital uses a system known as Accudose. Once the pharmacy authorizes the dispensing of medications through the computer system, the PEC can withdraw those medications from their own locked medications room.
[8] Gillespie was the only security officer on duty that night armed with a firearm.

6

back. Meanwhile, Gillespie backed up and reached towards his pistol while Bryan held Warner's left arm. At 4:43:30, Warner began to try using the Taser against Bryan, so Bryan retreated to a small adjacent room.

At 4:43:34, Warner fired the Taser at Bryan, missing him but hitting a door frame. Warner then chased Bryan into the room where he began trying to deploy the Taser at him again, nicking Bryan in the upper left arm. As Warner and Bryan were in the smaller room, Gillespie slowly began to walk towards that room. As Gillespie did so, he removed his pistol from its holster and had it at his right hip pointing forward.

At 4:43:39, Warner ran out of the small room back into the main room with his arm extended pointing the Taser. At the same time, Gillespie raised his gun. The distance between them was six to seven feet. According to Gillespie and Moore, he yelled at Warner to "stop, drop it."[9] While it is hard to say for sure because there is no audio, at 4:43:40 it appears that Gillespie fired a shot into Warner's right thigh just as the laser sight from the Taser in Warner's hand illuminated on Gillespie's badge. At the same time, a cartridge from the Taser ejected and hit the floor. Bryan briefly came out of the room and grabbed Warner from behind but he quickly released Warner and retreated back into the small room. The shot had no apparent impact on Warner.

Gillespie began backing up as Warner continued to point the Taser in his direction. At 4:43:41, Gillespie fired what appears to be the second shot; the camera actually caught the muzzle flash. This shot creased Warner's abdomen and entered his left arm. Warner continued running towards Gillespie with the Taser pointed in Gillespie's direction, although his motion was slightly stumbling. The third shot appears to be at 4:43:42, although it again is difficult to be sure as there is no audio. This shot apparently hit Warner in the chest.

As Gillespie stepped back and to his right, Warner brushed past him and fell to the floor. He landed on his knees and elbows but almost immediately began to get back up. At 4:43:44, he got to his knees and hands with his torso parallel to the floor when it appears Gillespie, who was standing about four feet away, fired the fourth and final shot into Warner's lower left flank. With that, Warner collapsed to the floor on his back.

With that, Bryan came out of the back room and joined Gillespie. Moore and Rudder, who had gone to a back room during much of the struggle, came out and called for medics. At 4:44:15, Bryan kicked the Taser away from Warner's reach. At 4:44:30, Warner tried to get up but fell back to the floor. At 4:44:41, two other Centra security officers entered the PEC. At that same time, Gillespie got on the phone with 911 and said that he was a "security supervisor with Centra and just shot a patient at the PEC unit."

---

[9] Rudder was in a back room by this time  Bryan is hearing impaired and at some point just before the struggle his hearing aid batteries went dead. All he heard was the shots

7

At 4:45:02 and again at 4:45:33, Warner tried to get up but both times collapsed to the floor. At this point, as he was placed in handcuffs, he tried to grab the arm of a female security officer, Dana Luck, in an attempt to bite her. Even after that, he continued to struggle intermittently; on one occasion even grabbing at Gillespie's gun again.

Gillespie reported that Warner said nothing from the time he tried to grab Gillespie's gun until the time he was shot. However after Warner was shot, he started reciting Bible verses. Luck also remembered on one occasion Warner making a religious reference.

Gillespie told the investigating officers that once the attack started and his Taser was taken, all he had left was his pistol. He said this was a really terrible situation that had to be stopped because everyone's lives were in danger if Warner was able to use the Taser to get his gun.

During the course of this investigation, LPD detectives made several attempts to interview Warner and his family. This was done through contacting his mother and later his attorney, Mr. Valois. All efforts were rebuffed. Based on the medical reports, press releases from Mr. Valois and media reports, we believe that Mr. Warner is now paralyzed from the T7 vertebrae down.



## LEGAL ANALYSIS

### A. WESLEY GILLESPIE

The first, and predominate, issue for this report is this: should Mr. Gillespie face some criminal liability for taking potentially deadly action against Jonathan Warner or did he act in self-defense?

8

"The common law in this state has long recognized that a person who reasonably apprehends bodily harm by another is privileged to exercise reasonable force to repel the assault." Diffendal v. Commonwealth, 8 Va. App. 417, 421 (1989). As a result, the Model Jury Instruction Committee of the Supreme Court of Virginia has drafted an appropriate jury instruction embodying the elements of self-defense.

> "If you believe that the [shooter] was without fault in provoking or bringing on the difficulty, and if you further believe that:
> 
> 1. the [shooter] reasonably feared, under the circumstances as they appeared to him, that he was in danger of being killed or that he was in danger of great bodily harm; and
> 2. he used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm;
> 
> then the [shooting] was in self-defense."

See, Perricllia v. Commonwealth, 229 Va. 85 (1985); Foster v. Commonwealth, 13 Va. App. 2380 (1991)(defense of others is included in common law self-defense).

There are two important principles to be gleaned from the above language. First, the threat must be reasonably perceived by the actor as an imminent danger, by some overt act, of death or serious bodily injury. The question is not whether the threat was an actual danger. The question is whether the actor reasonably perceived an immediate threat to his safety or the safety of others at the time he acted. See, Couture v. Commonwealth, 51 Va. App. 239 (2008). Second, the response to the threat must, at the time of the response, be proportionate to the threat itself.

So, is it reasonable to conclude that Mr. Gillespie perceived some overt act that led him to believe that he or others were in danger of death or serious bodily injury? The answer is yes.

Warner clearly was in the grips of a mental health crisis. Gillespie was doing all he could, not only as a security officer, but as an ordained minister and a human being, to lessen Warner's anxiety. Gillespie talked to Warner at the emergency room, building some rapport with him as a method of comfort. He calmly walked Warner over to the PEC, talked to him for a short period, and shook his hand before leaving.

When the folks in the PEC were unable to communicate effectively with him, Warner asked if Gillespie could come back over to talk to him. Gillespie did so and they spoke for 22 minutes, with Gillespie remaining calm and sedate as Warner paced the floor. When Warner tried to call someone on the phone and there was no answer, that seemed to exacerbate Warner's anxiety.

Suddenly and without provocation, Warner attacked Gillespie and tried to grab his pistol. The investigative report does not mention either Warner's or Gillespie's height or weight but it does

9

state that on January 11, Gillespie was 68 and Warner was 28 - a 40 year age difference. The video shows Warner to be 4-6 inches taller than Gillespie and have a more muscular physique. Additionally, when he was interviewed by LPD detectives, Gillespie said that Warner had a "strength that would surpass any normal human being at that time."

After struggling for 20 seconds to grab Gillespie's pistol, Warner was able to grab Gillespie's Taser instead. Had Warner incapacitated Gillespie with the Taser at any time, he easily would have been able to take Gillespie's gun. Although Gillespie's radio appeared to be broken, even if he or someone else in the PEC would have called for help, that help would not arrive until too late. And since Gillespie was the only officer at the hospital armed with a firearm, any arriving help would have been badly outgunned.

After Warner attacked Bryan with the Taser, he ran back towards Gillespie. After yelling to Warner to stop and drop the Taser, Gillespie fired a shot just as the Taser's laser sight lit up his chest. That bullet, which struck Warner in the right thigh, did nothing to slow Warner down. Nor did the second bullet that creased his chest and entered his left arm. The third shot brought Warner down to floor on his knees and elbows but he immediately tried to get back up.

The issue is not whether in hindsight Warner was still a real threat to Gillespie before that fourth shot was fired. We will never know. The issue is whether Gillespie reasonably perceived an overt act of imminent danger of death or serious bodily harm at the time he fired that fourth shot that left Warner paralyzed.

Given all that had transpired during those 44 seconds, Gillespie's perception of the danger at that point in time was reasonable. A much younger, larger and stronger man had tried to kill him and others. That man had been struck with three bullets in three seconds and was still beginning to get up. The reasonable conclusion was that Warner was getting up to attack Gillespie again.

Second, was Gillespie's response to the perceived threat proportionate to that threat? Again the answer is yes. Gillespie had a reasonable fear that he and the others in the PEC were going to be shot to death if Warner gained control of the gun. Although Gillespie fired four shots in four seconds, there was a short pause between each one to see if there was any impact. After the fourth shot was fired and the immediacy of the threat was over, Gillespie holstered his weapon and fired no more shots.

I therefore conclude that at the time he fired the shots which hit Jonathan Warner, Security Officer Wesley Gillespie was acting in reasonable self-defense of himself and others.

B. JONATHAN WARNER

As stated above, I have received several phone calls from individuals demanding that I charge Mr. Warner with assaulting Gillespie and robbing him of his Taser.

10

Unlike the analysis for Mr. Gillespie above, I can quote no case law that impacts my decision. Instead I quote Attorney General (later Supreme Court Justice) Robert H. Jackson as he addressed the Association of United States Attorneys in 1940. I have tried to live by these words all my professional career.

> "The qualities of a good prosecutor are as elusive and as impossible to define as those which mark a gentleman. And those who need to be told would not understand it anyway. A sensitiveness to fair play and sportsmanship is perhaps the best protection against the abuse of power, and the citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humility."

In Mr. Warner's case, I considered not only the facts as I found them above, but considered the fact that he has, and probably will always have, a significant mental illness. If charges were placed against him, he would have a viable defense of insanity at the time of the offense.

Equally important, I considered the fact that as a result of what happened in the early morning of January 11, he will most likely be paralyzed for life. If he deserved any punishment at all, he has already been punished enough.

As a result, I will not be seeking any charges against Jonathan Warner for attacking Security Officer Wesley Gillespie.

## CONCLUSION

For the foregoing reasons, I will not be seeking any criminal charges against Wesley Gillespie or Jonathan Warner for the events that occurred at the Centra Lynchburg General Hospital on January 11, 2016.

11